UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 3:13-cr-00764-WHO-1 |
|---|---|
| Plaintiff, | |
| v. | **ORDER ON BARRY GILTON AND LUPE MERCADO'S POST-TRIAL MOTIONS** |
| BARRY GILTON & LUPE MERCADO, | |
| Defendants. | Re: Dkt. Nos. 2270, 2271, 2322, 2323, 2330, 2343 |

Defendant Barry Gilton participated in the murder of Calvin Sneed on June 4, 2012, and his longtime partner and the mother of their four children, Lupe Mercado, lied to the police to conceal Gilton's involvement in the murder. Those facts are not in real dispute. But the defendants' motions for acquittal raise a different inquiry. Was Barry Gilton a member of the Central Divisadero Playas ("CDP"), a violent criminal racketeering enterprise in San Francisco whose members murdered their rivals and manipulated women and girls into prostitution? And did Lupe Mercado deceive law enforcement with knowledge of that enterprise's purposeful involvement in the murder?

I have presided over the government's case against ten alleged members of CDP and Mercado for more than six years. I tried five defendants for four months in 2018–2019, where the government presented a comprehensive case concerning the enterprise and its activities dating back to 2003. Each defendant was convicted by the jury of being a member of the enterprise, amongst other crimes. Four other defendants later pleaded guilty to being members of CDP, amongst other crimes. Barry Gilton and Lupe Mercado were the final two indicted defendants to be tried. Their trial lasted a month and ended with the jury's verdict on March 10, 2020.

There was no evidence in either trial that Barry Gilton or Lupe Mercado was involved in

CDP's racketeering activities until Sneed's murder.  By that date, they had learned that Sneed was sex trafficking their 17-year-old daughter, Leticia Gilton.  They were desperate to get their daughter away from him.  The evidence showed that Barry Gilton met up with two known members of CDP, Antonio Gilton and Alfonzo Williams, in the early morning hours of June 4, 2012, and drove them to his neighborhood, where Sneed was on his way to pick up Leticia.  One of the men in the car shot Sneed in the head and killed him.  After the murder, Mercado misled the police in several ways to conceal what she knew.  Barry Gilton and Mercado were arrested on June 9, 2012.  Gilton has been in continuous custody since then, and Mercado remained in custody until last summer.

The jury acquitted both defendants of murdering Sneed in aid of racketeering.  They convicted Barry Gilton of participating in the affairs of a racketeering enterprise and Lupe Mercado of being an accessory after the fact of the murder in aid of racketeering.  Now before me are both defendants' motions for a judgment of acquittal or a new trial.

What makes Barry Gilton's motion vexing is that he undeniably participated in Sneed's murder.  But he was indicted for being a member of a Racketeer Influenced and Corrupt Organizations Act ("RICO") enterprise, and the evidence does not allow a rational inference that his agreement to kill Sneed contemplated a pattern of racketeering activity as required by RICO.  As horrendous as it was, one racketeering act is not enough.  That Barry Gilton knew that CDP would continue its criminal activities does not allow the inference that he intended that result or would participate in any such activities.  As detailed below, I will grant his motion for a judgment of acquittal but uphold Lupe Mercado's conviction for accessory after the fact.

## BACKGROUND

### I.     FACTUAL HISTORY

Viewing the evidence in the light most favorable to the government for purposes of the pending motions, the following facts were established at trial.[1]

---

[1] The defense vigorously disputed the accuracy and significance of a great deal of the evidence described below, most significantly, the government's theory that Barry Gilton and Lupe Mercado shot at Sneed in Los Angeles and that Mercado was dishonest with authorities when she filled out missing person reports about her daughter.

United States District Court
Northern District of California

United States District Court
Northern District of California

**A.     CDP**

The CDP gang operated in the Fillmore District of San Francisco for many years.  Gang members frequently spent time at 1458 Grove Street, where Alfonzo Williams lived, and a BBQ restaurant at the intersection of Divisadero and Grove Streets.  RT at 379:19–380:6, 466:10–11.  Cooperating witness JB explained that being a member of CDP meant to "commit crimes together, such as robbing, shooting, killing, selling drugs."  RT at 484:11.  Gang members who earned the title "bangas" were consistent shooters and had the most respect within CDP.  RT at 410:7–17, 411:1–19 ("And it's basically an honor within the gang to be called a banga."); *see also* RT 397:20–23 (noting that members gained status by "consistently shooting, like, handling all your business").  Those who refused to commit violence or to retaliate against disrespect ran the risk of losing standing within the gang and being seen as weak.  *See* RT at 522:21–23, 523:23–5:24–14.

The parties distilled a great deal of the evidence about the CDP enterprise presented at the first trial into 14 pages of stipulations, which the government presented to the jury through the testimony of various witnesses.  *See* Government Trial Stipulations ("Gov't Stipulations") [Dkt. No. 2230].  The stipulations described the August 14, 2008 murders of Andrew Helton and Isiah Turner for which Charles Heard and Reginald Elmore were convicted, the November 1, 2010 murder of Jelvon Helton for which Jaquain Young was convicted, the May 20, 2011 shooting of Patrick McCree for which Adrian Gordon was convicted, and the October 18, 2011 murder of Donte Levexier.  *See id.* ¶¶ 1–42.  After describing each murder, the stipulations read, "There is no evidence that Barry Gilton or Lupe Mercado participated in this incident."  *Id.* ¶¶ 19, 24, 30, 42.  The stipulations further describe nearly two dozen other occasions on which various members of CDP committed robberies, engaged in shootouts, and were found in possession of firearms or drugs.  *See* Gov't Stipulations ¶¶ 43–64.  After describing these incidents, the stipulations read, "There is no evidence that Barry Gilton or Lupe Mercado participated in any of the incidents in this document."  *Id.* ¶ 65.

The government also presented evidence that several members of CDP were pimps and that older members encouraged younger members to obtain prostitutes to work for them.  RT at 442:5–7, 442:21–25, 443:1–24, 446:1–11, 449:11–21, 468:12–19, Trial Ex. 722.  As documented

in an undercover operation, two members of CDP encouraged someone they believed was a 16-year-old girl to engage in prostitution. RT at 605:17–648:21; Exs. 723, 763c. A government expert on prostitution, pimping, and child exploitation explained that pimps are "master manipulators" who find and exploit vulnerabilities in girls and young women. RT at 357:9–24.

### B.    Los Angeles

Barry Gilton and Lupe Mercado and their four children lived in the Fillmore District for many years. In 2011 when their daughter Leticia was 17 years old, she moved to Los Angeles to live with Barry Gilton's cousin Antonio Gilton, Antonio's longtime girlfriend Amber Hernandez, and their three children. RT at 1397:23–1398:1, 244:10–17. While in Los Angeles, Leticia Gilton began dating a man named Calvin Sneed, a member of the Nutty Bloc Crips gang in Compton who trafficked girls for a living. RT at 1401:5–1402:9; Defense Stipulations [Dkt. No. 2231] 2. Over time, Sneed persuaded Leticia to engage in sex work. RT at 1402:10–17, 1446:3–11. He used threats and violence to coerce her into continuing to prostitute for him, and he retained all the money that she earned. RT at 1446:12–1448:18.

In the spring of 2012, Barry Gilton and Lupe Mercado learned that Leticia was being trafficked. *See* RT at 252:12, 1403:6–21; Trial Ex. 1925. Mercado traveled to Los Angeles in May of 2012, and she saw Leticia at Antonio Gilton and Amber Hernandez's apartment on May 26. RT at 255:1–3, 1407:9–14. Mercado and Leticia got into an argument when Mercado learned that Leticia had a sexually transmitted disease. RT at 1408:16–1409:20. Mercado tried to convince Leticia to return to San Francisco, but Leticia refused. RT at 1409:12–16. Later Mercado texted her daughter, "I didn't come out here to sleep.I told you I'm do my homework on Mines I didn't come all the way to la to sleep.you and the grown ass man have a goodnight you guys are gonna need it." Trial Ex. 1925. She also texted, "I love you so much I'll do anything I gotta do to get my shit talking don't give a fuck about nobody or thing daughter back and I really mean anything I ain't leaving till I do. I give fuck if gotta go broke or jail anything . . . ." Trial Ex. 1925.

Barry Gilton flew to Los Angeles on May 27, 2012. Trial Exs. 1108c, 1098. According to cell site location information, Barry Gilton and Lupe Mercado were near the marijuana dispensary

where Leticia worked, and they spoke with her by phone.  RT at 1219:23–1226:24, 1413:6–23,

1650:12–20; Trial Exs. 880c-02, 1108c.  That evening when Sneed arrived to pick Leticia Gilton

up at the end of her shift, Barry Gilton and Lupe Mercado fired nine shots at him.  *See* RT at

1411:1–1412:2, 1567:24–1576:5; Trial Ex. 1108c.  According to a receipt from a gas station in

Bakersfield, CA, Barry Gilton and Mercado then drove back to San Francisco in the middle of the

night.  Trial Ex. 1164a.

On May 31, 2012, Mercado returned to Los Angeles with her mother and reported Leticia

as missing with the Compton sheriff's department, even though she remained in contact with her

daughter.  RT at 1226:25–1227:7, 1491:2–1493:1; Trial Exs. 941, 1925.  On June 1, 2012,

Mercado made a second missing person report in a federal database.  Trial. Ex. 3002.  On June 2,

2012, after texting with Leticia about her visiting San Francisco, Mercado texted: "still love you

even more than you know and about to show you how much ready set be ready you're gonna feel

it even if I'm not there but you'll know .and nobody can't even come close. . . . They say talk is

cheap I truly believe it .that's why I'm show you what really love does for theirs."  Trial Ex. 1925.

### C.     The Sneed Murder

Sneed and Leticia drove to San Francisco on June 3, 2012.  RT at 1418:10–18.  After

Leticia went with her parents to visit extended family in the East Bay, they returned to their house

at 35 Jennings Court.  RT at 1418:23–1419:12; Trial Ex. 1108a.  Leticia argued with her parents

and told them she was returning to Los Angeles, and then called Sneed and asked him to pick her

up.  RT at 1420:7–8, 1423:10–21, 1714:18.

Barry Gilton then called Antonio Gilton and drove to 1458 Grove Street, where he met

Antonio Gilton and Alfonzo Williams.  Trial Exs. 908, 1108a; RT at 1658:4–11, 97:12, 1752:21,

1754:11.  Williams got a gun out of his car, and Barry Gilton drove the other two to the Bayview

neighborhood near his home.  Trial Ex. 1108a; RT at 1753:3–9, 1755:13.  At 1:56 a.m., Sneed

texted Leticia Gilton to come outside.  RT at 1715:19.  One minute later, Mercado made a 13-

second call to Barry Gilton's phone.  Trial Ex. 880c.

Barry Gilton, Antonio Gilton, and Alfonzo Williams began tailing Sneed's car.  One of

them shot Sneed in the head near the intersection of Meade and Le Conte Avenues at

5

1   approximately 2:00 a.m.  Trial Exs. 875a, 878, 887; RT at 671:23–673:11, 824:16–17, 938:22–

2   947:9.  The three men drove back to 1458 Grove Street and parted ways.  Trial Exs. 908, 1108a.

3   Sneed died within hours.  RT at 1127:14; Trial Ex. 1862.

4       **D.     After the Murder**

5           A call from Leticia Gilton to Lupe Mercado's phone moments after Sneed was shot lasted

6   for more than a minute.  RT at 1663:2–5.  Leticia Gilton could be heard sobbing in a brief 911 call

7   she made afterward.  Trial Ex. 1932; RT at 1640:11–1642:17.  A neighbor who came outside after

8   the shooting heard Leticia Gilton say, "They didn't have to do him like that."  RT at 726:4–11.

9   Although their house at 35 Jennings Court was just two blocks away, neither Barry Gilton nor

10  Mercado came to the scene.  RT at 1486:18–21.  An officer went to their home and knocked on

11  the door; when Barry Gilton answered, he was "extremely calm and collected."  RT at 694:22–

12  700:9.

13          A few hours after the shooting, an inspector spoke with Barry Gilton and Mercado when

14  he saw them parked in front of Bayview police station.  RT 879:23–881:22.  Mercado told the

15  inspector that Leticia Gilton was being "exploited" and asked, "How would you feel if your

16  daughter was exploited?"  RT at 881:20–21.  When Leticia Gilton saw her parents inside the

17  police station, she became hysterical again and had to be separated from them.  RT at 884:15–

18  885:24, 1110:2–16.

19          The day after Sneed's murder, Mercado canceled her cell phone.  RT at 1207:7–8; Trial

20  Ex. 880.  Mercado was present when, around the same time, Barry Gilton told his sister and

21  brother-in-law that he had to "put away the young man."  RT at 1346:4, 17.  When Mercado spoke

22  with an inspector who was investigating the homicide, she told him that Leticia Gilton had been

23  staying with Barry Gilton's cousin Amber Hernandez in Los Angeles.  Trial Ex. 896.  When

24  pressed about whether Antonio was living there as well, Mercado said no.  Trial Ex. 896.  She said

25  that Barry Gilton had not traveled to Los Angeles in May, and she denied that he or she had ever

26  been near the marijuana dispensary where Leticia Gilton worked.  Trial Ex. 896.  When asked

27  where she and Barry Gilton were around the time around the murder, she stated that she did not

28  remember.  Trial Ex. 896.

United States District Court
Northern District of California

## II.    PROCEDURAL HISTORY

Barry Gilton, Lupe Mercado, Antonio Gilton, and Alfonzo Williams were initially charged with the Sneed murder in state court, but they were transferred in the midst of trial to federal custody after the Grand Jury returned the indictment in this case.  Barry Gilton has been in custody since June 9, 2012, and Lupe Mercado was in custody until I affirmed her release on July 9, 2019.  RT at 1099:17–21; Dkt. No. 2140.

On August 14, 2014, the Grand Jury returned a Second Superseding Indictment (SSI), charging twenty-two counts against eleven defendants, with five of those counts being against Barry Gilton and Lupe Mercado.  Dkt. No. 139.  Count One charged Gilton and nine others with conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity under 18 U.S.C. § 1962(d), and included a special sentencing factor of conspiracy to commit murder. SSI ¶¶ 1–17; *id.* ¶ 64.  Count Two charged Barry Gilton, Lupe Mercado, Antonio Gilton, and Alfonzo Williams with the murder in aid of racketeering of Calvin Sneed and for aiding and abetting one another in committing the murder.  Counts Three and Four charged the same four defendants with use and possession of a firearm in furtherance of the murder in aid of racketeering.  SSI ¶¶ 18–25.  Finally, Count Five charged Mercado with accessory after the fact of the murder in aid of racketeering.  SSI ¶¶ 26–27.

The first five defendants in this case were tried from November 6, 2017 to March 5, 2018. The jury convicted all five defendants on Count One for their activities as part of CDP.  Dkt. No. 1765.  A sixth defendant entered into a plea agreement on May 10, 2018, also admitting his guilt on Count One.  Dkt. No. 1810.

Three more defendants entered into plea agreements in May 2019 just before a second trial was set to begin against them and Barry Gilton.[2]  Dkt. Nos. 2110, 2107, 2111.  These three defendants also admitted their guilt on the Count One racketeering charge.  Both Antonio Gilton and Alfonzo Williams admitted that they participated in the Sneed murder and that "a substantial purpose for [the] murder was to maintain and increase position in the enterprise."  Dkt. Nos. 2113,

---

[2] Mercado's trial date was continued due to unavailability of counsel.

1 | 2114.

2 |   As a consequence of the last-minute plea deals and at Barry Gilton's request, I continued

3 | his trial.  Dkt. No. 2109.  I reset it to begin on February 3, 2020 so that he and Mercado could be

4 | tried together.  Dkt. No. 2156.  The parties gave their opening statements on February 5, 2020, and

5 | the case was submitted to the jury on March 3, 2020.  Dkt. No. 2278.  On March 10, 2020 the jury

6 | returned its verdict.  Dkt. No. 2295.  It convicted Gilton on Count One for violating 18 U.S.C. §

7 | 1962(d) and further determined that he knowingly and intentionally understood and agreed that the

8 | pattern of racketeering activity would include murder.  It acquitted both Gilton and Mercado on

9 | Count Two for the murder in aid of racketeering of Sneed, which resulted in an acquittal on the

10 | derivative Counts Three and Four.  Finally, the jury convicted Mercado on Count Five for

11 | accessory after the fact of the murder in aid of racketeering charged in Count Two.

**LEGAL STANDARD**

## I.  JUDGMENT OF ACQUITTAL

  Under Federal Rule of Criminal Procedure 29, the court "must enter a judgment of

acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R.

Crim. P. 29.  "[T]he relevant question is whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also*

*United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015).  "This familiar standard gives full

play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh

the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443

U.S. at 319.  The trial court should analyze a Rule 29 motion in the following manner:

> First, the evidence must be viewed in the light most favorable to the government; and second, the reviewing court must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict.

*United States v. Ramos*, 558 F.2d 545, 546 (9th Cir. 1977).

United States District Court
Northern District of California

8

United States District Court
Northern District of California

## II.     NEW TRIAL

Under Federal Rule of Criminal Procedure 33, "[u]pon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992). "The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Id.* (quoting another source). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Id.* at 1211–12 (quoting another source). The decision is within the sound discretion of the district court. *Id.*

**DISCUSSION**

## I.     BARRY GILTON'S COUNT ONE CONVICTION

This motion comes down to whether Barry Gilton's participation in the Sneed murder with members of CDP allows a rational inference that he reached an agreement the objective of which was a pattern of racketeering activities. Barry Gilton argues that his conviction cannot be sustained because his "agreement to have Sneed killed . . . contemplated only one act."[3] Supp. Mot. 1, 6. According to the government, because Barry Gilton committed murder with members of a racketeering enterprise whom he knew to be killers, the jury could "rationally infer that [his] conspiratorial agreement extended beyond just the Sneed murder." Oppo. Gilton 14.

### A.  Conspiracy to Violate RICO

"The essence of a RICO conspiracy is . . . an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering." *United States v. Brooklier*, 685 F.2d

---

[3] For purposes of the instant motion and viewing the evidence in the light most favorable to the government, Gilton does not dispute that the Sneed murder was a racketeering act.

United States District Court
Northern District of California

1208, 1216 (9th Cir. 1982), *cert. denied*, 459 U.S. 1206 (1983).  The statute defines a pattern as "at least two acts of racketeering activity."  18 U.S.C. § 1961(5).  But a racketeering conviction "does not require proof that a defendant participated personally, or agreed to participate personally, in two predicate offenses."  *United States v. Tille*, 729 F.2d 615, 619 (9th Cir. 1984).  Instead, "Proof of an agreement the objective of which is a substantive violation of RICO (such as conducting the affairs of an enterprise through a pattern of racketeering) is sufficient to establish a violation of section 1962(d)."  *Id.*; *see also Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) (noting that section 1962(d) requires allegations of "either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses").  Evidence of the defendant's participation or agreement with respect to two specific predicate offenses is required "only when proof of such an objective is lacking."[4]  *Tille*, 729 F.3d at 619.

"[C]onspiracy to violate RICO requires a showing that defendant 'was aware of the essential nature and scope of the enterprise and intended to participate in it.'"  *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) (quoting *United States v. Muskovsky*, 863 F.2d 1319, 1324 (7th Cir.1988)).  "This overall conspiracy requires the assent of each defendant who is charged, although it is not necessary that each conspirator knows all of the details of the plan or conspiracy."  *Brooklier*, 685 F.2d at 1222.  Instead, it is sufficient to establish that a conspirator "adopt[ed] the goal of furthering or facilitating the criminal endeavor."  *Salinas v. United States*, 522 U.S. 52, 65 (1997).

The RICO conspiracy provision is "even more comprehensive than the general [federal] conspiracy offense" because it does not require evidence of an overt act or specific act.  *Salinas*, 522 U.S. at 63.  For a general conspiracy conviction, "The agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture."  *United States v. Montgomery*, 384

[4] The government does not argue that the evidence supports a finding that Barry Gilton himself agreed to commit or participate in two predicate offenses.

1    F.3d 1050, 1062 (9th Cir. 2004).  Further, a defendant need not know the identity of all of the co-

2    conspirators to be convicted.  *United States v. Garza*, 980 F.2d 546, 553 (9th Cir. 1992).  Where

3    the evidence proves that a conspiracy existed, the government need only prove the defendant's

4    "knowing connection to that conspiracy, however slight."  *United States v. Meyers*, 847 F.2d

5    1408, 1413 (9th Cir. 1988); *United States v. Johnson*, 297 F.3d 845, 868 (9th Cir. 2002).

6         **B.  Barry Gilton's Connections to CDP**

7         Over the years of overseeing this case, I have become all too familiar with the heinous acts

8    of violence, pimping, and robberies committed by members of the CDP enterprise.[5]  None of that

9    evidence involved Barry Gilton until the time of the Sneed murder.

10        The following evidence connected Barry Gilton to CDP.  The Gilton family had a home on

11   Central Avenue, the street that contributed to the name Central Divisadero Playas.  RT at 384:1–3.

12   According to JB, the Gilton family was "dominant" and "real respected within CDP."  RT at

13   383:10–19, 384:4–7, 485:7-22.  Some Giltons were active members of CDP, including Antonio

14   and Scooty Gilton.  RT at 384:3–7, 483:17–25, 500:22–23.  There were also Giltons who, despite

15   not committing crimes with CDP, could nonetheless claim the neighborhood.  RT at 384:22–

16   385:8.  JB testified that if a Gilton family member who was not part of CDP asked him to do

17   something, he would do it.  RT at 485:7–14; *see also* RT at 485:18–19 (testifying that the Gilton

18   family was "basically a part of us").

19        Barry Gilton had relationships with several members of CDP, and some of those ties were

20   close.  His cousin Antonio Gilton, who lived with him and Lupe Mercado for a few years, referred

21   to Mercado as "mom" and Leticia as "sister."  RT at 1391:15–1395:15.  Barry Gilton also had a

22   longstanding friendship with CDP member Alfonzo Williams.  RT at 1394:5–21.  Witnesses

23   testified to having seen him at 1458 Grove Street on occasion.  RT at 84:12–85:17, 487:25–488:6,

24   1136:25–1137:24, 1156:18–1158:2.  Still images of a rap video filmed outside of 1458 Grove

25   Street showed Gilton displaying an "Uptown" hand sign along with several members of CDP.  RT

26

27   _____

28   [5] Barry Gilton does not dispute that the government presented sufficient evidence to meet the "not very demanding" standard for establishing an enterprise.  *See Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007).

at 93:15–21; Trial Exs. 1948-12, 1948-16, 1948-17.  JB overheard Barry Gilton speaking with CDP member Charles Heard about buying a stolen chain.  RT at 496:10–497:1; 497:12–21.  And Barry Gilton and Lupe Mercado attended the funeral of CDP member Julius Hughes.  RT at 1591:20–24, 1593:18–25, 1594:3–1595:11; Trial Ex. 810.

In addition, as detailed earlier, the evidence supports a finding that Gilton arranged to kill Calvin Sneed with Antonio Gilton and Alfonzo Williams, two active members of the gang. According to the government, this evidence allowed the jury to infer that Barry Gilton conspired to violate RICO.

### C. Barry Gilton's Conviction Requires an Irrational Inference

Barry Gilton's lack of involvement in CDP until the Sneed murder meant that only one theory was available to the government:  he joined the gang when he asked Antonio Gilton and Alfonzo Williams for help.  But RICO requires a pattern; at least two acts.  The fact of the Sneed murder does not allow a rational inference that Barry Gilton intended any second act of racketeering to occur, whether committed by him or any member of CDP.  One enterprise crime does not allow the inference of a second.  Without intent with respect to a second act, no rational jury could find that Barry Gilton reached an agreement the objective of which was a pattern of racketeering.

The government's argument displays the limitations of the inferences that can be drawn from the Sneed murder.  It asserts that it was "in [Barry Gilton's] interest" to be aligned with CDP with respect to the Sneed murder, and that "could easily be true for him again in the future." Oppo. Gilton 14.  But the *possibility* that Gilton might rely on CDP again in the future—pure speculation—does not allow an inference of the intent that is required.  The government also argues that "[n]o matter whether he would personally participate in additional criminal acts, he understood and intended for CDP to continue to carry out" racketeering activity, *id.* at 14–15; it was enough that Barry Gilton "understood that CDP would conduct its affairs through a pattern of racketeering," *id.* at 15 n.3.  But knowledge is not enough, as the government agreed at the hearing on the motion, and neither is knowledge plus one racketeering act.  The evidence must allow a rational inference that Barry Gilton *intended* for CDP's racketeering to continue.  It does not.

United States District Court
Northern District of California

1    Additional evidence from the trial confirms that the inference necessary to sustain Barry

2    Gilton's conviction is irrational.  The government repeatedly highlighted his social connections to

3    CDP—his years living in the Fillmore, his relationships with members of the gang, and his

4    appearance in the rap video.  But that evidence supports another inference that is less helpful for

5    the government's case:  if Barry Gilton had wanted to be part of CDP, he could have joined at any

6    moment.  Instead, he encouraged boys from the neighborhood to stay away from gang violence.

7    Defense witness Nate Ford recommended Barry Gilton for a job at the Boys and Girls Club, where

8    he worked with kids who were "kind of rough around the edges."  RT at 1859:17–1860:7.

9    Defense witness Jesslin Robinson, who played on Barry Gilton's basketball team at the Boys and

10   Girls Club and now works as a corrections officer in Arizona, testified that he spent many nights

11   and weekends at Barry Gilton and Lupe Mercado's home.  RT at 1823:3–1824:1, 1824:18–23,

12   1825:15–1826:14.  He attributed his ability to "make it out" and go to college in part to Barry

13   Gilton's mentorship.  RT at 1828:8–1829:21, 1826:17 ("He brought me in as if I was his son.");

14   *see also* RT at 1973:15–1974:5 (defense witness Brandon Banks) (testifying about his knowledge

15   of Barry Gilton from their shared time at Ella Hill Hutch Community Center).  Further, the jury

16   acquitted him of having an enterprise-related motive for participating in the Sneed murder.  As the

17   government acknowledges, Barry Gilton was desperate to get his daughter away from the man

18   who was exploiting her.  *See* RT at 2161:16–17 (government closing) ("Concern for his daughter

19   has got to be in that list of purposes [on the night of the Sneed murder] too.").

20   Further, the Sneed murder is quite different from the acts that made up the pattern of

21   racketeering that CDP was otherwise engaged in over the course of years.  The evidence at trial

22   established that CDP's most violent conduct was aimed at rival gangs in San Francisco and served

23   to avenge the deaths of its own members.  By contrast, Sneed was from Los Angeles, and there is

24   no evidence that his gang had any prior dealings with CDP.  Further, members of CDP including

25   Alfonzo Williams were pimps, while Barry Gilton wanted Sneed dead precisely because he was a

26   pimp.  Other than the involvement of Antonio Gilton and Alfonzo Williams, which I will discuss

27   in more detail regarding Mercado's motion for acquittal, the Sneed murder had little to do with the

28   CDP enterprise, much less its success.

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1    To be clear, the evidence in the previous two paragraphs is not necessary to entitle Gilton

2    to a judgment of acquittal.  I am not weighing the evidence.  But I cite it to further demonstrate the

3    irrationality of the inference that Barry Gilton—who had stayed out of gang life and encouraged

4    better for kids in the neighborhood—suddenly agreed in his late thirties to go all in for a violent

5    criminal enterprise, when what motivated him to kill was care for his daughter.  *See Montgomery*,

6    384 F.3d at 1062 (noting in the context of a general conspiracy that an agreement can be found if

7    the conspirators' "own benefits depended on the success of the venture").  His knowledge of

8    CDP's past racketeering cannot bridge the gulf between one racketeering act and a pattern;

9    between conspiracy to commit murder and conspiracy to violate RICO.  The inference required to

10   sustain the conviction in this case is an irrational one.

11   Gilton's agreement to commit one racketeering act—abhorrent as that act was—does not

12   allow the inference that he agreed to a second racketeering act.  He is entitled to acquittal on

13   Count One.

14   **II.    MERCADO'S COUNT FIVE CONVICTION**

15   The jury convicted Mercado on Count Five for accessory after the fact of the murder in aid

16   of racketeering of Calvin Sneed.  Because the jury acquitted Barry Gilton on Count Two,

17   Mercado's Count Five conviction must have rested on a finding that Antonio Gilton or Alfonzo

18   Williams committed VICAR murder.

19   A person is an accessory after the fact if, "knowing that an offense against the United

20   States has been committed," she assists the offender "in order to hinder or prevent his

21   apprehension, trial or punishment."  18 U.S.C. § 3.  "[A] defendant who is accused of being an

22   accessory after the fact must be shown to have had actual knowledge of each element of the

23   underlying offense."  *United States v. Graves*, 143 F.3d 1185, 1189 (9th Cir. 1998), *as amended*

24   (June 4, 1998).  Actual knowledge "may be shown entirely through circumstantial evidence."

25   *United States v. Burnette*, 698 F.2d 1038, 1051 (9th Cir. 1983).

26   Mercado challenges her conviction on two main grounds.  First, she argues that the jury

27   instructions impermissibly expanded the scope of the indictment against her because they allowed

28   the jury to convict her for accessory to simple murder rather than murder in aid of racketeering.

1   Second, she argues that she is entitled to acquittal on Count Five because the evidence does not

2   support a finding that a VICAR murder was committed or that she knew a VICAR murder had

3   been committed.

4           **A.      Jury Instruction Number 44**

5           Mercado first argues that Jury Instruction Number 44 allowed the jury to convict her for

6   accessory after the fact of simple murder, rather than murder in aid of racketeering, because it

7   lacks the word "racketeering" or "VICAR" and because it refers back to the elements of murder in

8   Count One, which describes simple murder.  Dkt. No. 2274.  She argues that the instructions failed

9   to clarify to the jury that they could convict her on Count Five only if they found that she knew a

10  VICAR murder had been committed.

11          The government submitted proposed Jury Instructions on December 2, 2019, including the

12  language that later became Instruction Number 44.  Dkt. No. 2213 at 71.  At a hearing with the

13  parties on February 26, 2020, I went through the instructions one by one and invited objections.

14  Dkt. No. 2264; RT at 2040:22–23 (addressing the Count Five instruction for accessory after the

15  fact).  The following day, I issued an order that included the instructions I intended to give as a

16  result of that hearing and further instructed the parties:  "Please review all of the instructions

17  carefully and file any necessary final edits, with highlighting or redlining, today."  Dkt. No. 2265.

18  I noted that either side should contact my Courtroom Deputy to request a further hearing on the

19  instructions if necessary.  *Id.*  That afternoon and the following day, the parties communicated a

20  few typographical edits to the instructions, Mercado requested an addition to Instruction Number

21  11, and both defendants objected to the government's interpretation of the aiding and abetting

22  instruction.  Dkt. Nos. 2269, 2272, 2273.  On Friday, February 28, 2020, I issued an order on the

23  remaining objections, Dkt. No. 2275, and posted the final Jury Instructions, Dkt. No. 2274.

24          On Monday, March 2, 2020, moments before the instructions were set to be read to the

25  jury, Mercado belatedly requested that Instruction Number 44 be altered to refer to "the murder in

26  aid of racketeering" rather than "the murder of Calvin Sneed."  RT at 2054:14–24; *see also id.* at

27

28

United States District Court
Northern District of California

15

1    2055:20–2056:1.[6]  I overruled her objection because the instructions as a whole did not

2    communicate to the jury that they could convict Mercado for accessory to simple murder.  I also

3    instructed the parties to make clear in their closing arguments that Mercado could only be

4    convicted on Count Five of accessory after the fact of a murder in aid of racketeering.  RT at

5    2056:18–2057:5.

6          "In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole

7    are misleading or inadequate to guide the jury's deliberation."  *United States v. Shryock*, 342 F.3d

8    948, 986 (9th Cir. 2003); *see Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973) ("[A] single

9    instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of

10   the overall charge.").  "[N]ot only is the challenged instruction but one of many such instructions,

11   but the process of instruction itself is but one of several components of the trial which may result

12   in the judgment of conviction."  *Cupp*, 414 U.S. at 147.

13         Throughout the trial, the parties and I made it clear that murder in aid of racketeering was

14   at the heart of this case.  The jury instructions indicated throughout that the defendants were

15   charged with enterprise-related crimes including VICAR murder, and I instructed the jurors not to

16   single out some instructions to the exclusion of others.  Further, the parties made clear during their

17   closing arguments that a VICAR purpose, or lack thereof, was key to the jury's deliberations.  *See*

18   Oppo. Mercado 16–20 (detailing the references to VICAR murder in closing arguments, including

19   with respect to Count Five).  The fact that the jury acquitted the defendants of VICAR murder

20   shows that they were focused on the relationship between the defendants' actions and the CDP

21   enterprise, and the verdict was not inconsistent as Mercado asserts.  Given this context, the

22   language of the accessory after the fact instruction did not allow the jury to convict Mercado of

23   accessory to simple murder.

24   **B.      There is Sufficient Evidence to Support Mercado's Conviction Count Five**

25         Mercado raises numerous challenges to the sufficiency of the evidence supporting her

26   _____

27   [6] Mercado's lawyer used the language "we had requested" during the argument over the objection, giving the impression that she had asked for this addition in the earlier back and forth.  I have reviewed the email exchanges between the parties and my Courtroom Deputy on the final draft of

28   the jury instructions, and Mercado requested no change to Instruction Number 44.

United States District Court
Northern District of California

United States District Court
Northern District of California

conviction for accessory after the fact.  According to her, the government failed to establish that Antonio Gilton or Williams committed VICAR murder, that she was aware of their involvement or their VICAR purpose, or that she took any actions to help them evade capture or prosecution.

### 1.   VICAR Murder

#### a.   Law

The Violent Crimes in Aid of Racketeering Act (VICAR) criminalizes certain violent actions when they are committed "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a).  A VICAR conviction requires that the government prove:  "(1) that the criminal organization exists; (2) that the organization is a racketeering enterprise; (3) that the defendant committed a violent crime; and (4) that the defendant acted for the purpose of promoting his position in a racketeering enterprise." *United States v. Banks*, 514 F.3d 959, 964 (9th Cir. 2008) (internal quotation marks, formatting, and citation omitted).

In one case, a district court granted a judgment of acquittal to a defendant who killed a man for disrespecting the defendant's girlfriend because no rational juror could have concluded that the defendant had an enterprise-related motive.  *United States v. Jones*, 291 F. Supp. 2d 78, 87 (D. Conn. 2003) (applying the VICAR motive standard from *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992), that the defendant's "general purpose in [committing the crime violence] was to maintain or increase his position in the enterprise").  The evidence at trial established that the defendant was the leader of a drug trafficking enterprise, and he and other leaders "were expected to use violence and intimidation to enforce the [e]nterprise's exclusive right to sell drugs" in their territory.  *Id.* at 82.  Witnesses explained that maintaining respect by "cultivat[ing] a reputation for violence" was necessary to the enterprise's success.  *Id.* at 83.

The district court vacated a jury's VICAR murder conviction because the evidence was not sufficient to support a finding that the defendant had a VICAR purpose.  *Id.* at 85–86.  The victim was not from the area, he had no involvement in drug trafficking, and he and the defendant had

never encountered one another before.  *Id.* at 87.  The factual circumstances of the killing were

entirely unrelated to the enterprise.  *Id.*  The court rejected the government assertion that the

defendant's leadership position in the enterprise required him to respond to the victim's disrespect

with violence:

> [T]here is no evidence to support the government's strained inference
> that Jones had a generalized need to use violence in response to all
> acts of disrespect—regardless of whether the disrespect was directed
> at him personally or was related to the affairs of the Enterprise—in
> order to maintain his position in the Enterprise or to further the
> Enterprise's objectives. Without such evidence, this inference is
> based only on speculation.

*Id.* at 88.  The court concluded, "In short, the government's theory leaves no principled basis for

distinguishing between violence that is within the ambit of VICAR and violence that is not within

its reach."  *Id.* at 89.

In *Banks*, the Ninth Circuit denied a defendant's motion for a judgment of acquittal where

the evidence, "though not conclusive," was enough to support the jury's verdict.  *United States v.

Banks*, 514 F.3d 959, 971 (9th Cir. 2008).  After believing he heard a gang rival's girlfriend insult

him, the defendant made multiple attempts to enact revenge, including shooting at the rival on two

occasions.  *Id.* at 963.  At trial, witnesses testified about the importance of respect within the gang,

and a former member testified that a member would lose respect by failing to "retaliate violently"

in response to an insult.  *Id.* at 971.  The defendant himself had faced taunting in the past when he

was bested in a fistfight with another individual a few years before.  *Id.* at 972.  While

acknowledging that a jury could have found that the defendant "was motivated primarily, or even

exclusively, by a personal vendetta," the Ninth Circuit noted that a challenge to the sufficiency of

the evidence required it to ask whether "'no rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt.'"  *Id.* at 971 (quoting *United States v. Daas*, 198

F.3d 1167, 1174 (9th Cir. 1999)).  In light of the evidence, the answer was "unequivocally 'no.'"

*Id.*

### b.    Analysis

A rational jury could have relied on the following evidence with respect to VICAR motive.

Both Antonio Gilton and Alfonzo Williams were part of the CDP enterprise.  Members of CDP

glorified violence:  known shooters, otherwise known as "bangas," earned the highest respect. Because respect was critical in the gang, members were expected to retaliate with violence against anyone who showed disrespect to them or those close to the gang.  For example, CDP members responded to the killing of CDP member Julius Hughes by murdering Jelvon Helton.  The Donte Levexier homicide, which was retaliation for the shootings of CDP member Greg Walker and his girlfriend, non-CDP member Kia Horace, supports an inference that the need to retaliate extended beyond the gang members alone.  Further, members of CDP engaged in pimping, so they were familiar with the ways in which Sneed was likely to be victimizing Leticia Gilton.

Evidence specific to Antonio Gilton and Williams also supported a VICAR motive finding. Much like the defendant in *Banks*, Antonio Gilton had a direct experience with the gang's expectation of retaliation:  after he failed to retaliate against the Eddy Rock gang when Skyler Stewart was killed, a CDP member took away his gun.  *See* RT at 457:21–458:11; *Banks*, 514 F.3d at 972.  JB testified that at the funeral of Aubrey Abrakasa, Alfonzo Williams told younger members of CDP that they needed to "step up" their retaliation against Eddy Rock.  RT at 452:24– 454:2.  Both men had relationships that allowed the jury to infer that they considered the disrespect to Leticia to require an enterprise-related response.  Antonio Gilton was close enough to Leticia to refer to her as his sister, and Williams had been friends with Barry Gilton for many years.  RT at 1391:15–1395:15.

Mercado raises weaknesses similar to those in *Jones* given that Sneed was from a Los Angeles gang and that there is no evidence that he or his gang had any prior dealings with CDP. *See Jones*, 983 F.2d at 87.  But given the evidence above and under the Ninth Circuit authority in *Banks*, a rational jury could conclude that both Antonio Gilton and Alfonzo Williams were motivated to kill Sneed in substantial part by a desire to increase or maintain their standing within CDP.  *See Banks*, 514 F.3d at 969.

### 2.      Mercado's Knowledge

Further, the evidence allows a rational inference that Mercado had the requisite knowledge to sustain her conviction.  Circumstantial evidence supports the inference that she was fully aware of the plan to kill Sneed.  Mercado called Barry Gilton just after Sneed texted Leticia Gilton to

United States District Court
Northern District of California

19

1   come out of the house; from this timing, the jury could infer that Mercado was telling Barry Gilton

2   that Sneed was close.  Leticia Gilton called Mercado just after the shooting, and yet Mercado

3   stayed home rather than walking two blocks to comfort her hysterical daughter; from this

4   evidence, the jury could infer that Mercado was not surprised by the killing.  Further, while the

5   mere fact of partnership and cohabitation could not support a finding that Mercado knew of Barry

6   Gilton's activities and shared his knowledge, the government's theory throughout the trial was that

7   Mercado and Barry Gilton were working together to get their daughter away from Sneed.  The

8   following evidence supported that theory:  Barry Gilton's last-minute flight to Los Angeles, the

9   proximity of their cell phones in Los Angeles, the attempt on Sneed's life while they were in Los

10  Angeles, and their frequent communication leading up to Sneed's death.  From this evidence, the

11  jury could infer that Mercado knew of Barry Gilton's plans, and thus of the involvement of

12  Antonio Gilton and Alfonzo Williams.  Finally, Mercado had her own, independent connection to

13  Antonio Gilton, who lived with the family for many years and called her "mom."  It was not

14  irrational for the jury to conclude from this evidence that Mercado knew about CDP, knew about

15  the plan to kill Sneed, and knew about Antonio Gilton and Alfonzo Williams's VICAR motive for

16  participating in the murder.

### 3.     Action to Prevent Apprehension or Prosecution

18          Finally, the jury could rationally infer that Mercado took action to prevent the

19  apprehension of Antonio Gilton and Alfonzo Williams.  During questioning after her arrest,

20  Mercado avoided mentioning Antonio Gilton's name when asked about Leticia's time in Los

21  Angeles.  Even when specifically asked about someone named Antonio, Mercado named only

22  Amber Hernandez.  Mercado was also dishonest with investigators about Barry Gilton's presence

23  in Los Angeles in May.  From this evidence, the jury could conclude that Mercado was attempting

24  to shift investigators' focus away from Barry Gilton and Antonio Gilton and, in so doing, help all

25  three men avoid apprehension and prosecution for VICAR murder.

26          This evidence was sufficient to sustain Mercado's conviction on Count Five, and a new

27  trial is not warranted.

28

**CONCLUSION**

For the reasons set forth above, Barry Gilton's motion for a judgment of acquittal on Count One is GRANTED, and the August 12, 2020 sentencing date is VACATED. A separate judgment of acquittal shall be entered. Lupe Mercado's motion for a judgment of acquittal or a new trial on Count Five is DENIED.

**IT IS SO ORDERED.**

Dated: July 27, 2020



William H. Orrick
United States District Judge